**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:15-cv-01035-KLM

DAVID J. WOLF, an individual; and
WOLF AUTO CENTER STERLING LLC, a Colorado limited liability company,

        Plaintiffs,

v.

MICHAEL SCHADEGG, an individual;
SHAWN COCHRAN, an individual;
CLIFFORD W. MILLER, IV, an individual;
JACOB L. SCHNEIDER, an individual;
CRAIG A. WRIGHT, an individual;
JOHN DOES 1 through 3;
KORF CONTINENTAL CHRYSLER JEEP DODGE, a Colorado corporation;
KORF CHEVROLET BUICK GMC, INC., a Colorado corporation;
KORF CONTINENTAL STERLING, a Colorado corporation;
KORF CONTINENTAL CHEVROLET BUICK, a Colorado corporation;
KORF CHEVROLET BUICK, INC., a Colorado corporation,
XYZ CORPORATION,

        Defendants.

---

## FIRST AMENDED COMPLAINT

---

       Plaintiffs David J. Wolf ("Wolf") and Wolf Auto Center Sterling LLC ("Wolf Auto"),

through their undersigned counsel, for their First Amended Complaint against Defendant

Michael Schadegg; Defendant Shawn Cochran; Defendant Clifford W. Miller, IV; Defendant

Jacob L. Schneider; Defendant Craig A. Wright; Defendants John Does 1 through 3; Defendant

Korf Continental Chrysler Jeep Dodge; Defendant Korf Chevrolet Buick GMC, Inc.; Defendant

Korf Continental Sterling; Defendant Korf Continental Chevrolet Buick; Defendant Korf

Chevrolet Buick, Inc.; and XYZ Corporation, allege and state as follows:

## PARTIES

1.     Wolf Auto is a Colorado limited liability company that owns and operates franchised automobile dealerships in northeastern Colorado and Nebraska.

2.     Wolf Auto's franchised dealerships are located in Sterling and Fort Morgan, Colorado, and Kimball, Ogallala, and Sidney, Nebraska.  Wolf Auto's related entities own and operate automobile dealerships in Bridgeport and Scottsbluff, Nebraska.

3.     As most directly relevant to this First Amended Complaint, Wolf Auto owns and operates a franchised automobile dealership at 520 E. Chestnut Street, Sterling, Colorado, 80751 for the Ford/Lincoln brands and the Chrysler/Ram/Dodge/Jeep brands.

4.     Wolf is a resident of Nebraska and resides at 601 W. U.S. Highway 30, Kimball, NE  69145.  Wolf is the sole member, and the managing member, of Wolf Auto.

5.     Wolf is the "Dealer Principal" under the franchise agreements with both Ford and Chrysler under which Wolf Auto operates the dealerships in Sterling, Colorado.

6.     Michael Schadegg ("Schadegg") is an individual who resides at 134 Roxberry Lane, Sterling, Logan County, Colorado 80751.

7.     Schadegg was formerly employed as the General Manager of Wolf Auto's Sterling dealerships, as well as its Fort Morgan, Sidney, and Holyoke (now closed) locations.

8.     Schadegg's employment with Wolf Auto was terminated at the volition of the employer on April 14, 2014.

9.     After his employment was terminated, Schadegg went to work for a direct competitor, Korf Continental Sterling ("Korf"), 1200 W. Main Street, Sterling, Colorado 80751. Schadegg may also work at other Korf stores located outside of Sterling, Colorado.

10.     Shawn Cochran ("Cochran") is an individual who resides at 3853 County Road 25, Merino, Logan County, Colorado 80741.

11.     Cochran was formerly employed by Wolf Auto as Finance and Insurance Manager.  Cochran voluntarily terminated his employment on May 7, 2014, and immediately went to work with Schadegg at Korf.  Cochran may work at other Korf stores in addition to the Korf store located in Sterling, Colorado.

12.     Defendant Clifford W. Miller, IV ("Miller") is an individual who resides at 140339 Derringer Road, Mitchell, Nebraska  69357.

13.     Miller was formerly employed as a salesperson at the Wolf Auto Sterling dealership.  Miller's employment with Wolf Auto ended on April 15, 2014, when he voluntarily resigned after Schadegg was involuntarily terminated on April 14, 2014.

14.     After his employment was terminated, Miller went to work for Korf.

15.     Miller currently works as the General Manager for a used car dealership owned by Korf in Scottsbluff, Nebraska.

16.     Jacob L. Schneider ("Schneider") is an individual who resides at 18421 U.S. Hwy. 6, Sterling, Colorado  80751

17.     Schneider was formerly employed as a salesperson at Wolf Auto's Sterling dealership.

18.     Schneider's employment was voluntarily terminated on May 15, 2014.

19.     After his voluntary resignation, Schneider went to work for Korf.  Schneider works at the Korf Sterling store and may also work at other Korf stores located outside of Sterling, Colorado 80751.

20.     Craig A. Wright ("Wright") is an individual who resides at 816 S. 5th Avenue, Sterling, Colorado 80751.

21.     Wright was formerly employed as a salesperson at Wolf Auto's Sterling dealership.

22.     Wright voluntarily resigned from Wolf Auto on May 6, 2014.

23.     After voluntarily resigning from Wolf Auto, Wright went to work for Korf at its Sterling location.  Wright may also work at other Korf stores besides the Korf store located in Sterling, Colorado.

24.     Korf Continental ("Korf") is a Colorado corporation that owns and operates franchised automobile dealerships and used vehicle dealerships in Northeastern Colorado and Western Nebraska.

25.     Korf's franchised dealerships are located in:  Yuma, Colorado; Sterling, Colorado; Fort Morgan, Colorado; Julesberg, Colorado; and Scottsbluff, Nebraska.  Korf may also have other related entities which own and operate other automobile dealerships.

26.     As most directly related this First Amended Complaint, Korf owns and operates a franchise automobile dealership at 508 W. 8th Avenue, Yuma, Colorado 80759 for the Chrysler, Jeep, and Dodge brands and the Chevrolet, Buick and GMC brands.

27.     Also directly relevant to this First Amended Complaint, Korf owns and operates a franchise automobile dealership at 1200 W. Main Street, Sterling, Colorado 80751 for the GMC, Buick, and Chevrolet brands.

28.     Korf is a direct competitor of Plaintiffs throughout Eastern Colorado and Western Nebraska.

29.     At all times relevant to the date of this First Amended Complaint, Korf employs Defendants Shadegg, Cochran, Miller, Schneider, and Wright and has done so since each Defendant ceased being employed by Wolf Auto Center Sterling.

**FACTUAL BACKGROUND**

30.     Wolf Auto, like all franchised automobile dealerships, depends heavily on its own internal computer systems as well as computer "web-based" systems provided through outside vendors for its day-to-day operations.

31.     Wolf Auto's principal internal dealer management software through July, 2012 was called Autosoft.  After July, 2012 Wolf Auto changed its dealer management software to a system called ASI.  Both Autosoft and ASI run on Wolf Auto's server.

32.     Wolf Auto's dealer management software program contains confidential, proprietary, and trade secret information on all aspects of its business, including payroll, banking, accounting, inventory records for new and used automobiles, parts inventory, profit and loss statements, monthly financial reports, sales and lease records, service records, warranty service records, customer contact information, customer credit information, customer transaction history, including financing and credit information, and floor plan financing.  Access to Wolf Auto's dealer management software is limited to certain key employees.

33.     Wolf Auto maintains its e-mail system through its own computer system.  Wolf Auto's employees are provided with e-mail addresses ending in the domain name: wolfauto.com.

34.     Wolf Auto's inventory records contained within its computer system include information on vehicle original acquisition cost, reconditioning costs, days held in inventory, retail asking price, and anticipated profit.  The system also contains information on sold or leased

vehicles, including a per unit profitability analysis.  All of this information is competitively sensitive, protected trade secret information, available only to certain limited Wolf Auto employees who are issued access credentials.

### Wolf Auto's Website

35.     Wolf Auto maintains a website, www.wolfauto.com, through which it advertises its products and services to the public.  As one of its functions, Wolf Auto's dealer management software (Autosoft and ASI) exports inventory information to update the www.wolfauto.com website so that inventory displayed on the website contains accurate and up-to-date information on price and location of inventory offered for sale at Wolf Auto's various locations.

36.     Wolf Auto's website collects contact information from consumers who interact with the website and express interest in purchasing or leasing either new or used automobiles, as well as scheduling service appointments.  This contact information is compiled in sales leads files available only to authorized salespersons employed by Wolf Auto.

### Log-Me-In Portal

37.     Access to Wolf Auto's computer systems is restricted to employees with authorization.  Authorized employees with proper security credentials and log-in codes can access Wolf Auto's computer information either in-store or remotely through the Log Me In secure access portal.

38.     Log Me In maintains records of all log-ins which were logged into the Wolf Auto system, including the date, time, Host IP address and User IP location.

**Manufacturers' Websites**

39.     Wolf Auto's franchisors (Ford and Chrysler) contract with third-party vendors for certain functions essential to their dealerships' businesses.  One such third-party-provided service is known as SalesPoint, a customer relationship management program unique to Ford.

40.     Access to SalesPoint is accomplished by obtaining a secure Ford login ID, set up through Security Provisioning Services.  Ford forwards sales leads to its dealers through the secure SalesPoint website for the exclusive use of its dealers.  Access to SalesPoint is restricted to one dealership employee with authorization to access the program.  During his employment, Schadegg was the only Wolf Auto employee with a SalesPoint user ID and access code.

41.     Chrysler has a similar customer relationship management system called "dealer.com."  Like Ford's SalesPoint, access to Chrysler's dealer.com is restricted to employees with proper authorization and secure access codes.  Chrysler forwards potential sales leads to its dealers via the dealer.com secure website.

42.     Sales leads information from Sales Point and dealer.com is provided to dealers in specific geographic areas, depending on the location of the prospective customer.  It is not available to competing dealers or to the general public.  Rather, it is protected confidential and proprietary information accessible only to sales persons employed with Wolf Auto who have been provided authorization to view this information as part of their job responsibilities.

**Defendant's Unauthorized Access**

43.     During his employment, Schadegg had authorized access to Wolf Auto's computer systems and programs as part of his job responsibilities.  Schadegg was credentialed as the administrator on the Autosoft and ASI programs and, thus, had a level of access to make

changes, such as adding and removing authorized users.  Schadegg's level of authorization was not available to other system users with lower security levels.

44.     Schadegg's authorization to access Wolf Auto's computer systems and programs terminated on April 14, 2014 contemporaneous with the termination of his employment.  On that date, Wolf Auto employees Chuck Cummings, IT Manager, and Veta Fritzler, Office Manager, were instructed to remove Schadegg's access to all Wolf Auto computer systems and protected websites, both internal and external.  Management at Wolf Auto were given the impression that the removal of Schadegg's access to Wolf Auto's computer system and protected websites had been completed.

45.     Following the termination of his employment with Wolf Auto, Schadegg commenced employment with Korf, a competing automobile dealership with operations in Sterling, Yuma, Julesburg, Brush and Fort Morgan, Colorado, and Scottsbluff, Nebraska.

46.     Chuck Cummings quit his employment with Wolf Auto on April 18, 2014.

47.     At some point during his employment with Wolf Auto, Cochran set up his own e-mail address "wolfauto@hotmail.com."  Cochran received e-mail at this address and received company e-mails at this address.  He also accessed these e-mails under the Wolf Auto domain at the address "finance.sterling@wolfauto.com."

48.     Upon Cochran's voluntary resignation from Wolf Auto on May 7, 2014, management took efforts to remove Cochran's access to all Wolf Auto computer systems and protected websites, both internal and external.  Management at Wolf Auto were under the impression that this had been successfully completed.

49.     Upon the separation from employment of Miller, Schneider, and Wright, management took efforts to remove their access to all Wolf Auto computer systems and protected websites, both internal and external.  Management at Wolf Auto were under the impression that this had been successfully completed.

50.     Several months after Schadegg, Cochran, Miller, Schneider, and Wright ceased working at Wolf Auto, it was discovered Schadegg, Cochran, and possibly others associated with them, including Miller, Schneider, and Wright, wrongfully accessed the Wolf Auto secured computer systems multiple times after April 14, 2014.  Schadegg, Cochran, Miller, Schneider, and Wright unlawfully accessed the Wolf Auto secured computer systems via external sites such as Dealer Car Search ("DCS"), by using the user ID of wolfauto@hotmail.com.  In addition, Schadegg improperly accessed SalesPoint by using a secure user ID of "M.Schade."

51.     Following the termination of his employment on April 14, 2014, Schadegg continued to remotely access Wolf Auto's computer server to gain access to Wolf Auto's confidential, proprietary and trade secret information.  Likewise, following the termination of his employment on May 7, 2014, Cochran continued to remotely access Wolf Auto's computer server to gain access to Wolf Auto's confidential, proprietary and trade secret information.  After their separation from employment from Wolf Auto, Miller, Schneider, and Wright continued to remotely access the Wolf Auto computer server.  By doing so, Schadegg, Cochran, Miller, Schneider, and Wright, and possibly others associated with them, gained an improper and unfair competitive advantage over Wolf Auto.

52.     An example of their improper access includes, on at least the following dates, 05/22/14, 05/23/14, 08/05/14, 08/14/14, and 09/04/14, Schadegg, Cochran, and possibly other

Korf employees wrongfully accessed Wolf Auto's data on wolfauto.com from a computer with an IP address of 199.36.233.62, which is an IP address assigned to Korf since September 26, 2012.

53.     On May 13, 2014, which was Cochran's second day of employment with Korf, Cochran logged into Dealertrack using Wolf Auto's credentials.

54.     On July 2, 2014, Cochran sent numerous numerous text messages which described the exact number of units by store that Wolf Auto sold in June.  This information was obtained by Cochran by wrongfully accessing the Wolf Auto computer system.

55.     Other examples of Cochran accessing the Wolf Auto computer system and obtaining information that was confidential to the company includes on July 8, 2014, Cochran sent text messages to various individuals including Schneider, which discussed the fact that as of July 8, 2014, the Wolf Auto store in Sterling had not sold a single unit.  He also informed Schneider that the Wolf Auto store in Fort Morgan has sold three units and the Wolf Auto store in Sidney, Nebraska, had sold two units.  Again, the only way Cochran could obtain such confidential information is by accessing the Wolf Auto computer system.

56.     In addition, on July 10, 2014, Cochran sent a text indicating that the Wolf Auto Sterling store had sold two units.  On July 12, 2014, Cochran sent a text message which states, "Wolf has 12 out in Sterling, Fort Morgan and Holyoke."  On July 24, 2014, Cochran sent several text messages including, "Wolf has 12 cars out this month in Sterling, Holyoke, Fort Morgan, and Sidney combined."  Cochran obtained this information by accessing the Wolf Auto computer system.

57.     On or around July 24, 2014, Wolf Auto posted required manufacturer financial statement on its computer system.  Only two people in the entire dealership had knowledge of the financial reports, that being Wolf and his controller, Veta Fritzler.  On that same day, Cochran sent a text message which said, "they [Wolf] lost 65,000 last month."  Cochran obtained this information by improperly accessing the Wolf Auto computer system.

58.     On or around July 28, 2014, a business broker who represented Korf called Wolf and said something to the effect of, "Have you had enough, yet?  Are you willing to entertain selling your Sterling store?"

59.     The timing and the content of the phone call from the business broker demonstrates that Korf knew its employees were improperly accessing Wolf Auto's computer system and Korf was benefitting from their improper conduct.

60.     Another example of Defendants engaging in unauthorized access of the Wolf Auto computer system is evidenced by text messages between Cochran and Schadegg on December 13, 2014.  On that date, Shadegg sent a text message to Cochran which says, "What is the Autocheck login?"  Cochran texted back, "5042424 Wolf 1234 Or Wolf 12345."  Shadegg texted back, "okay thanks."  This was the Wolf Auto Autocheck login on December 13, 2014.

61.     Autocheck is a service purchased by dealerships in order to obtain a full history on a used vehicle.  It is similar to the product known as Carfax.  It is clear from the December 13, 2014, text message between Shadegg and Cochran that they continued to access Autocheck through the Wolf login credentials and at Wolf Auto's expense.

62.     On at least the following dates, 05/01/14, 05/02/14, 05/08/14, 05/09/14, 05/12/14, 05/13/14, and 05/14/14, former Wolf Auto employee Miller wrongfully accessed Dealer Car

Search through an IP address of 65.41.103.154, which IP address is assigned to a computer at the address of Janice Miller of Lebanon, Kansas, a first degree relative of Mr. Miller. Mr. Miller was employed by Korf at the time he improperly accessed Dealer Car Search.

63.     On numerous occasions between the termination of his employment on April 14, 2014 and November 6, 2014, Schadegg wrongfully accessed Wolf Auto's account with Ford's Sales Point leads program using the credentials that were supplied to him while he was employed by Wolf Auto. On information and belief, formed after inquiry, Schadegg also wrongfully accessed Chrysler's dealer.com sales leads program after his employment with Wolf Auto terminated.

64.     Wolf Auto believes these dates are but a few of the many instances of unauthorized access to its computer systems which contained proprietary competitively sensitive trade secret information. This access was completed by Schadegg, Cochran, Miller, Schneider, Wright, and possibly other Korf employees. The unauthorized access was to the financial detriment of Wolf Auto and financially benefited Korf.

**Chrysler Incentive Program Payments**

65.     Chrysler offers a variety of extended vehicle protection plans to consumers through its dealer network. The plans, termed Mopar Vehicle Protection, can either complement the manufacturer's warranty on new cars, or provide certain levels of repair coverage on Certified Pre-Owned and traditional pre-owned vehicles. The plans are offered to consumers with a variety of time and mileage terms.

66.     Chrysler maintains promotional incentive programs to reward dealers for selling Mopar Vehicle Protection Plans to consumers. Under various dealer incentive programs, dealers

can earn certain bonus or incentive payments depending on the amount of sales of qualifying
plans.

67.     While Chrysler funds the Mopar payments, Imperial Marketing ("Imperial")
administers the incentive program for Chrysler.  Tico Porter ("Mr. Porter") is the contact at
Imperial for Wolf Auto's interaction with the Mopar incentive programs.

68.     Chrysler, through its agent, Imperial, periodically sends forms to the dealer-
principal of participating dealerships through which the dealer principal enrolls in that year's
program or re-enrolls in prior years' programs.  The enrollment form designates the persons or
accounts to whom the incentive payments are to be made.  For example, some dealer-principals
might elect to have all or a portion of their incentive payments directed back into the dealership
business.  Other dealer-principals might elect to have all or part of the incentive payments made
to themselves by reloadable debit card or direct deposit into a personal bank account.

69.     As a condition of participating in the promotional incentive programs, the
dealership pays an enrollment fee.

70.     While employed by Wolf Auto, and since at least 2012, Schadegg submitted
paperwork to Imperial for the incentive programs.  In doing so, Schadegg falsely represented that
he was the Dealer-Principal of Wolf Auto, and directed the incentive payments be made fifty
percent (50%) to himself and fifty percent (50%) to Cochran.

71.     Wolf first learned of Schadegg's and Cochran's illegal diversion of the Mopar
Vehicle Protection incentive payments when he received a call from Mr. Porter in June, 2014
asking him to whom the next incentive payments should be sent, since Schadegg and Cochran
were no longer employed at Wolf Auto.

72.     Upon further investigation, Wolf learned that Schadegg and Cochran had been wrongfully diverting the Mopar incentive program payments to themselves since at least 2012.

73.     As examples of the incentive payments wrongfully diverted from the dealership and Wolf, Schadegg and Cochran each received payments from the Extreme Profit Sharing incentive program of $5,279.85 on April 18, 2014, four days after Schadegg's employment was terminated.  Similarly, they each received payments of $6,891.40 on January 17, 2014.  Similar payments were made directly to Schadegg and Cochran without Wolf's knowledge in 2013, 2012, and possibly before 2012.

74.     Schadegg and Cochran also received and split incentive payments under other incentive programs including, without limitation, "Gross Profit Corporate Funds," "Gross Profit Dealer Funds," and "Revenue Sharing STAR Performers."  Schadegg and Cochran were not authorized to receive these payments.

75.     On May 2, 2014, Cochran sent Schadegg a text message which said, "Lol login in to your Chrysler rewards and claim your reward Lol.  Your welcome."

76.     The amount of incentive program payments currently known to have been wrongfully diverted to Schadegg and Cochran is approximately $93,802.80.  Discovery may show this amount to be greater.

77.     Plaintiffs sent Schadegg and Cochran a written demand that they each immediately reimburse Wolf Auto for all amounts they wrongfully received through the Mopar inventive program.  Each Defendant has failed to reimburse Plaintiffs.

### JURISDICTION – 28 U.S.C. § 1331
### AND
### VENUE – 28 U.S.C. § 1391(b)

78.     The principal claim against defendants arises under the laws of the United States,

particularly 18 U.S.C. § 1030, the federal Computer Fraud and Abuse Act.  This court has

jurisdiction pursuant to 28 U.S.C. § 1331.  The court has supplemental jurisdiction over the other

claims for relief because they are sufficiently related to the federal claim and arise from a

common nucleus of operative facts. 28 U.S.C. § 1367(a).

79.     A substantial portion of the acts giving rise to Plaintiffs' claims occurred in the

District of Colorado.  Venue is proper under 28 U.S.C. § 1391(b).

### FIRST CLAIM FOR RELIEF
### (Computer Fraud and Abuse Act 18 U.S.C. § 1030 Against All Defendants)

80.     Plaintiffs incorporate by reference the preceding allegations in this First Amended

Complaint.

81.     Following the termination of their employment, and the concomitant termination

of their authorization to access Wolf Auto's Computer systems and server through Log Me In or

any other access portal, Schadegg, Cochran, Miller, Schneider, Wright, and possibly other Korf

employees, accessed Wolf Auto's internal dealer management software and gained unauthorized

access to Wolf Auto's confidential, proprietary, and trade secret information, including payroll,

banking, accounting, inventory records for new and used automobiles, parts inventory, profit and

loss statements, and monthly financial reports to the franchisors, sales and lease records, service

records, warranty service records, customer contact information, customer credit information,

customer transaction history, including financing and credit information, and floor plan

financing.

82.     Following the termination of their employment, and the concomitant withdraw of their authorization to access Wolf Auto's Computer systems through Log Me In or any other access portal, Schadegg, Cochran, Miller, Schneider, Wright, and possibly other Korf employees, accessed Wolf Auto's website-generated customer leads generated through potential customer interactions with the Wolf Auto website.

83.     Following the termination of their employment, and the concomitant withdraw of their authorization to access Wolf Auto's confidential information, Schadegg, Cochran, Miller, Schneider, Wright, and possibly other Korf employees, continued to remotely access Wolf's proprietary information including sales leads available exclusively to Wolf Auto through the third party lead generating services offered through Ford and Chrysler (SalesPoint and dealer.com).

84.     Schadegg, Cochran, Miller, Schneider, Wright, and possibly other Korf employees, sought an unlawful competitive advantage for the benefit of themselves and Korf, through the wrongful access to and unauthorized use of confidential business information contained in Wolf Auto's computer systems.

85.     Schadegg, Cochran, Miller, Schneider, Wright, and possibly other Korf employees, intentionally accessed Wolf Auto's computer systems, and the confidential, competitively sensitive information contained therein, after their authorization terminated.

86.     The value of the information wrongfully obtained by Defendants through their violation of the Computer Fraud and Abuse Act ("CFAA") exceeds $5,000 to Wolf Auto in any one-year period.

87.     Wolf Auto's computer systems and servers are "Protected Computers" as defined in Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).

88.     The conduct by Schadegg, Cochran, Miller, Schneider, and Wright of intentionally accessing Wolf Auto's computer system after termination of their employment was done knowingly, intentionally and with intent to defraud, without authorization or in excess of authorized access.

89.     The wrongful actions of Schadegg, Cochran, Miller, Schneider, Wright, and Korf have caused damage, competitive harm, and business injury to Wolf Auto's business of at least $5,000 in any one-year period.  Defendants' conduct was intended to harm Wolf Auto's business and increase Korf's business and Korf's profits.  By improving Korf's business and profits, Schadegg, Cochran, Miller, Schneider, and Wright intended to increase their own earnings and income.

90.     Wolf Auto hired a computer forensic firm to investigate and assess the extent of Defendants' unauthorized access to its computer systems, for which it incurred charges in excess of $5,000.

91.     Upon discovering Defendants' repeated unauthorized access to its computer systems and server in late 2014, Wolf Auto took actions to secure its computer systems and servers from further unauthorized access by Defendants and others.

92.     The CFAA provides a private right of action to Wolf Auto against Defendants and others who may have acted in concert with them at 18 U.S.C. § 1030.

93.     As a result of Defendants' conduct, Plaintiffs are entitled to an award of compensatory damages, consequential damages, as well as injunctive and equitable relief, the legal costs related to this action, attorneys' fees, and forensic computer expert fees.

### SECOND CLAIM FOR RELIEF
**(Theft of Trade Secret Information – C.R.S. § 7-74-101, *et seq.* Against All Defendants)**

94.     Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

95.     Without authorization, on multiple occasions, Defendants accessed Wolf Auto's computer system and server through Log Me In and other access portals, including Wolf Auto's internal dealer management software.  In doing so, Defendants gained unauthorized access to Wolf Auto's confidential, proprietary, and trade information, including payroll; banking; accounting; inventory records for new and used vehicles; parts inventory; profit and loss statements; and monthly financial reports to the franchisers.  Defendants also obtained access to sales and lease records; service records; warranty and service records; customer contact information; credit record information; customer transaction history, including financing and credit information; floor plan financing; and website-generated customer lead information.

96.     Prior to this unauthorized access, Wolf Auto had invested considerable time, effort, and financial resources to develop and protect its trade secrets.  Wolf Auto had treated this information as confidential and has diligently protected this information from discovery by unauthorized parties.  This information gives Wolf Auto an advantage over its competitors who do not know of it, or how to use it.

97.     Access to this information was restricted by the Wolf Auto computer system.

98.     The information improperly obtained and used by Defendants was not readily obtainable from public directories or other outside sources.  Competitors could not duplicate this information.

99.     The protected information as described in this First Amended Complaint constitutes trade secrets of Wolf Auto pursuant to C.R.S. § 7-74-102, *et seq*.  The trade secrets were obtained by the Defendants without consent of Wolf Auto.

100.    Defendants knew, or should have known, the trade secrets were acquired by improper means.

101.    As a result of Defendants' conduct, Wolf Auto sustained damages including, but not limited to:  lost sales, damage to its reputation, lost profits, loss of goodwill, and other economic damages.  Wolf Auto will continue to be harmed through Defendants' knowledge of, and continued use or disclosure of, Wolf Auto's trade secrets.

102.    As a result of Defendants' actions, Plaintiffs are entitled to damages for their actual losses caused by the misappropriation by Defendants and the unjust enrichment caused by the misappropriation by Defendants.

103.    Wolf Auto requests all Defendants be enjoined from accessing, disclosing, using, or continuing to possess Wolf Auto's trade secrets and confidential and proprietary information.

104.    Defendants should be ordered to pay all actual and consequential damages resulting from Defendants' wrongful conduct including, but not limited to, lost profits, loss of goodwill and ordered to disgorge all profits wrongfully obtained.

105. The misappropriation by Defendants was attended by circumstances of fraud, malice, and willful and wanton disregard of Wolf Auto's rights. Therefore, Wolf Auto is also entitled to exemplary damages pursuant to C.R.S. § 7-74-104.

## THIRD CLAIM FOR RELIEF
### (Civil Theft Against Defendants Schadegg and Cochran)

106. Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

107. Schadegg and Cochran knowingly and fraudulently obtained payments from the Mopar Vehicle Protection Incentive Programs.

108. Defendants knowingly obtained those payments without authorization from Wolf or Wolf Auto.

109. Defendants knew the Mopar incentive payments were the property of Wolf Auto or Wolf.

110. Defendants obtained these payments with the specific intent to permanently deprive Wolf and Wolf Auto of the monies they were entitled to receive under the Mopar Vehicle Protection Incentive Programs.

111. Despite Plaintiffs' demand that Schadegg and Cochran return all monies wrongfully obtained, Schadegg and Cochran have failed to reimburse Plaintiffs.

112. Defendants' conduct has caused serious damage to Plaintiffs, which entitles Plaintiffs to all their actual damages as a result of the thefts including, but not limited to: loss of income; lost profits; consequential and compensatory damages; special damages; treble damages; interest on the amounts that were wrongfully obtained by Defendants; all costs related to this

action, including reasonable attorneys' fees; and any other award or remedy the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### (Civil Theft Against All Defendants)

113.    Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

114.    Schadegg, Cochran, Miller, Schneider, Wright, and possibly other employees of Korf, John Does 1 through 3, and XYZ Corporation wrongfully accessed the Wolf Auto computer system multiple times after April 14, 2014, via wolfauto@hotmail.com through Log Me In and possibly other means.

115.    In doing so, Defendants obtained valuable customer leads which deprived Wolf Auto of valuable motor vehicle sales and other sales and service income.  Defendants also accessed valuable trade secrets and other information concerning Wolf Auto inventory, acquisition costs, retail prices, profitability analysis, and other confidential competitively sensitive trade secret information.

116.    Upon Defendants' accessing this information illegally, that information was used to create an unfair competitive advantage against Wolf Auto.

117.    Defendants knowingly obtained control over the Wolf Auto confidential trade secret information with the specific intent to permanently deprive Wolf Auto of the use and benefits of this information and property.

118.    Defendants' conduct constitutes theft pursuant to C.R.S. §§ 18-4-401, *et seq*.

119.    Defendants' conduct has caused serious damage to Plaintiffs which entitles Plaintiffs to all of their actual damages as a result of the thefts including, but not limited to:  loss

of business; lost profits; loss of income; loss of goodwill; consequential and compensatory

damages; special damages; treble damages; interest on the monies Plaintiffs were deprived of as

a result of Defendants' actions, all costs related to this action, including attorneys' fees; and

other damages the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF
### (Conversion Against Defendants Schadegg and Cochran)

120.    Plaintiffs incorporate by reference the preceding allegations in this First Amended

Complaint.

121.    Defendants' actions of wrongfully obtaining Mopar incentive payments which

were the property of Wolf Auto and/or Dave Wolf, and failing to reimburse Wolf Auto per the

demand sent to Defendants, constitutes an unauthorized act of dominion or ownership of

Plaintiffs' property and money.

122.    Plaintiffs are the rightful owners of the property Defendants wrongfully and

knowingly took from Defendants without authorization or approval.

123.    Defendants knew that they had wrongful possession of the Mopar incentive

payments.  Defendants knew that Plaintiffs had a legal right to the receipt and possession of the

incentive payments.

124.    Despite Plaintiffs' demand for full reimbursement of the monies wrongfully

taken, Defendants have failed to reimburse Plaintiffs.  Defendants know that they continue to

deprive Plaintiffs of their property.

125.    Defendants' acts of conversion have caused damages to Plaintiffs.  Defendants'

wrongful conduct entitles Plaintiffs to their actual damages as a result of Defendants' conduct

including, but not limited to:  all general and special damages and all other remedies, both legal

and equitable to which Plaintiffs are entitled; all costs related to this action, including reasonable attorneys' fees; and any other award or remedy the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Defendants Schadegg and Cochran)

126.   Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

127.   Schadegg was employed as the General Manager of Wolf Auto, which is a senior position with the company.  As the General Manager of Wolf Auto, Schadegg owed fiduciary duties to Plaintiffs.

128.   Cochran worked as the Finance and Insurance Manager of Wolf Auto.  Cochran held a senior position at Wolf Auto.  As the Finance and Insurance Manager, Cochran owed fiduciary duties to Plaintiffs.

129.   Pursuant to these duties, Schadegg and Cochran were obligated to act in the best interest of Plaintiffs at all times and to protect the economic and other business interests of Plaintiffs during their employment.

130.   Schadegg's and Cochran's conduct of diverting Mopar promotional incentive payments from Plaintiffs to themselves without authorization to do so constitutes a breach of the fiduciary duties each Defendant owed to Plaintiffs Wolf and Wolf Auto.

131.   As a result of Schadegg's and Cochran's conduct, Plaintiffs were deprived of at least $93,802.80 in Mopar incentive payments.  It is anticipated discovery will show the actual amount of damages caused by the conduct of Schadegg and Cochran will be greater.

132.   As a result of Defendants' breach of their fiduciary duties, Plaintiffs have incurred losses and damages, including loss of profits, loss of income, and all other general and special

damages, as well as all other legal and equitable remedies to which Plaintiffs are entitled, expenses from the cost of this action, interest, and reasonable attorneys' fees.

## SEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment Against All Defendants)

133.    Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

134.    Wolf Auto has invested considerable time, effort, and financial resources in developing its trade secrets and confidential and proprietary information described herein.

135.    Defendants' conduct of improperly accessing the Wolf Auto computer system, including customer leads, resulted in Defendants receiving income and other benefits they otherwise would not have received.

136.    Defendants' conduct resulted in the diversion of business income from Plaintiffs to Defendants.  Such conduct caused damage to Plaintiffs, depriving them of income they should have received.

137.    In addition, Schadegg and Cochran were not authorized to receive any of the Mopar incentive payments described above.

138.    Through the actions described above, Defendants have been unjustly enriched to Wolf Auto's detriment and its expense.  Defendants have benefitted from the Mopar payments they received, which resulted in injury to Plaintiffs by diverting business income and payments from Plaintiffs to Defendants.  Such conduct caused damage to Plaintiffs, depriving them of income Wolf Auto and Wolf should have received.

139.    Under the circumstances, it would be unjust for Defendants to retain the Mopar payments and other things of value derived from their activities including, but not limited to, profits and income, without payment of proper value to Wolf Auto and Wolf.

## EIGHTH CLAIM FOR RELIEF
### (Civil Conspiracy Against All Defendants)

140.    Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

141.    Schadegg, Cochran, Miller, Schneider, Wright, John Does 1 through 3, Korf, and XYZ Corporation agreed by words and conduct to access the Wolf Auto computer system by unlawful means.  Defendants conspired to do so in order to accomplish the unlawful goal of illegally obtaining Wolf Auto customer leads, stealing Wolf Auto trade secrets and obtaining confidential and proprietary financial information owned by Wolf Auto.

142.    Defendants' ultimate goal was to force Dave Wolf to sell the Sterling store and/or cause the Sterling store to go out of business and close its doors.  This plan and conspiracy is evidenced by the numerous text messages between Schadegg, Cochran, Miller, Schneider, and Wright concerning their goal and plan to reach that goal.

143.    For example, beginning in late May, 2014, there are numerous text messages between Shadegg and other defendants who, at the time, were still employed at Wolf Auto. These text messages discussed the ultimate plan to resign from Wolf Auto, go to work at Korf, and ultimately put Wolf Auto out of business.  Examples include, but are not limited to:  on April 28, 2014, Shadegg texted Miller, "Besides all that Dave tell everyone I went to Korf and this could be an awesome sneak attack that he would not see coming."  By May 2, 2014, there are text messages between Shadegg and Cochran concerning Cochran's start date at Korf.

144.     On July 14, 2014, there are multiple text messages between the General Manager of Korf, Brian Larson, and Shadegg concerning the Wolf Auto Holyoke store.  Within those text messages, Brian Larson stated that he was obtaining information about the possible closing of the Wolf Auto Holyoke store from his "cousin Connie who is the city clerk."

145.     On July 30, 2014, the following text message exchange occurred between Miller and Shadegg:

| | |
|---|---|
| Miller: | I can't wait to be a factor in burying that POS. |
| Shadegg: | He will go down. |
| Miller: | Just trust each other and we will be perfect like they say on Friday Night Lights movie yes he will.  He is on his way already.  What's up with Winstrom [Wolf Auto Sales Manager in Kimball, Nebraska]. |
| Shadegg: | Should be done this month the GM rep already knows. |

146.     On May 2, 2014, there are text messages between Shadegg, Cochran, and Wright concerning the plans for each of the Defendants to leave Wolf Auto and join Shadegg at Korf.

147.     On April 21, 2014, while Cochran was still employed at Wolf Auto, there are additional text messages between Cochran and Schadegg concerning their plans, including the following from Cochran to Shadegg, "Based on the reaction about Chuck [Chuck Cummings, former IT employee for Wolf Auto] from both days and Winstrom [Sales Manager at Wolf Auto, Kimball store], they have no idea what's coming."

148.     On June 27, 2014, the following text messages between Cochran, Schneider, and Wright went as follows:

Did you know Casey [Wolf employee] quit today?

No how'd that go?

They talk him out of it?

> Is he going to let him stay for awhile or is he done today?
>
> I'll bet he's pissed about that.
>
> I'll bet it ain't fun around the Wolf supper table anymore.
>
> Shit, that don't pay no bills.
>
> All that's left is the final blow from Winstrom.
>
> Oh shit, he won't be any fun to be around.
>
> No shit.  I'll bet we could get thousand a month guaranteed to go back until he [Wolf] went tits up.  Lol.
>
> But, I don't know what we would do after September.

149.    On October 23, 2014, Cochran discusses his impressions of Wolf Auto's financial problems in several text messages.

150.    On November 24, 2015, there is an e-mail by Cochran where he discusses having a Korf employee perform a dealer trade with Wolf Auto and not disclose that the vehicle has a bad engine.  He concludes the text message conversation with, "Fuck Dave Wolf.  That's the plan."

151.    The pursuit of these unlawful goals by Defendants resulted in, and continues to result in, unfair competition and wrongful interference with Wolf Auto's business opportunities and operations.

152.    In order to accomplish these unlawful goals, Defendants repeatedly and unlawfully accessed Wolf Auto's computer system and network.  Each of the Defendants was aware of each other's actions and activities in pursuit of the conspiracy and did not object to, or cease participation in this conspiracy.

153.    The damages and losses suffered by Wolf Auto from April 2014 to the present were caused by the illegal acts engaged in by Defendants in order to accomplish their illegal goals.

154.     As a result of the repeated unlawful conduct by Defendants, Wolf Auto suffered damages including, but not limited to:  loss of sales; loss of income; loss of business; loss of goodwill; and loss of profits.  Defendants' conduct entitles Wolf Auto to general and special damages, and all other remedies, both legal and equitable to which Plaintiff is entitled, reasonable attorneys' fees, as well as interest on all amounts proven at trial.

## NINTH CLAIM FOR RELIEF
### (Tortious Interference With Prospective Business Advantage Against All Defendants)

155.     Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

156.     Defendants intentionally accessed the Wolf Auto computer system on numerous occasions with the intent to steal Wolf Auto customer leads and learn of Wolf Auto's pricing so that they could undercut Wolf Auto's pricing levels, thereby obtaining more sales, revenue and profits to the detriment of Wolf Auto.

157.     By using the information wrongfully acquired from Wolf Auto, Defendants approached and continued to approach Wolf Auto's customers and prospective customers with the intent of persuading them to cease or reduce the amount of business Wolf Auto reasonably and properly could have expected to obtain from the prospective and past customers.  For example, on September 29, 2014, Miller and Cochran had an e-mail exchange about the fact Korf was working on a sale of a vehicle to a previous Wolf Auto customer.  Miller's text message says, in part, "Hope they drive through Wolf's lot . . . ."

158.     Defendants acted with the intent of interfering with Wolf Auto's continuing business relationships and preventing new business relationships from developing, all of which would have occurred, but for Defendants' interference.

159.     As a result of Defendants' conduct, Wolf Auto has sustained extensive damages in an amount to be proven at trial, including:  loss of sales; loss of business; lost profits; and loss of goodwill.  Defendants' conduct entitles Wolf Auto to general and special damages, and all other remedies, both legal and equitable to which Plaintiff is entitled, legal costs associated with this action; attorneys' fees, as well as forensic computer expert fees.

## TENTH CLAIM FOR RELIEF
### (Fraudulent Concealment Against Schadegg and Cochran)

160.     Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

161.     Schadegg and Cochran knowingly and fraudulently obtained payments from the Mopar Vehicle Protection Incentive Program.

162.     Defendants knowingly obtained those payments without knowledge or authorization from Wolf or Wolf Auto.

163.     Defendants knew the Mopar incentive payments were the property of Wolf Auto and/or Wolf.

164.     Defendants obtained these payments with the specific intent to permanently deprive Wolf and Wolf Auto of monies that they were entitled to receive under the Mopar Vehicle Protection Incentive Program.

165.     Defendants intentionally concealed from Wolf and Wolf Auto that they were receiving the Mopar incentive payments.  In order to receive the payments, Schadegg fraudulently signed documents indicating that he was the "Dealer Principle" of Wolf Auto.

166.     Defendants knowingly and with intent, concealed receipt of the Mopar incentive payments from Wolf and Wolf Auto.  Defendants intended that the concealment be maintained in order for Defendants to continue to receive funds they were not entitled to receive.

167.     Wolf first learned of Shadegg's and Cochran's illegal diversion of the Mopar Vehicle Protection Incentive Program payments when he received a call from Mr. Porter of Imperial Marketing.  During that phone conference, Mr. Porter asked Mr. Wolf were the next incentive payment should be sent, since Shadegg and Cochran were no longer employed at Wolf Auto.

168.     Defendants' conduct deprived Wolf and Wolf Auto of at least $93,802.80, not including interest.  Discovery may show this amount to be greater.  Discovery may also show other incentive payments were received by Defendants and were intentionally concealed by Defendants.

169.     Defendants' conduct has caused serious damage to Plaintiffs, which entitles Plaintiffs to all their actual damages as a result of the theft including, but not limited to:  loss of business; lost profits; loss of income; loss of goodwill; consequential and compensatory damages; special damages; treble damages; interest on the monies Plaintiffs were deprived of as a result of Defendants' actions; all costs related to this action, including attorneys' fees; and other damages the Court deems just and proper.

## ELEVENTH CLAIM FOR RELIEF
### (*Respondeat Superior* Against Korf)

170.     Plaintiffs incorporate by reference the preceding allegations in this First Amended Complaint.

171.    The conduct of Shadegg, Cochran, Miller, Schneider, and Wright as described in the first claim for relief, second claim for relief, fourth claim for relief, seven claim for relief, eighth claim for relief, and ninth claim for relief of this First Amended Complaint occurred while each of the Defendants were employed with Korf.  The improper conduct of each Defendant occurred while each Defendant was acting within the course and scope of employment with Korf.

172.    As described in this First Amended Complaint, Defendants' conduct of improperly accessing the Wolf Auto computer system, as well as actions taken by Defendants in their conspiracy to force Wolf Auto out of business, occurred while Defendants were within the course and scope of their employment with Korf.

173.    Korf, as the employer, is liable for the damages an employee causes while in the course and scope of employment.

174.    The conduct by Defendants as described in this First Amended Complaint were performed in the service of Korf's business and in the interests of increasing Korf's business and profits, to the detriment of Wolf Auto.  The improper conduct by Defendants was performed with the intent to serve Korf's interests and was connected with their authorized acts.

175.    Korf is liable for the conduct of Shadegg, Cochran, Miller, Schneider, and Wright, and other Korf employees, even if Korf did not authorize the manner of performance.

176.    In addition, Ron Korf, owner of Korf, and Brian Larson, General Manager of Korf, knew or should have known of the improper conduct that was being engaged in by the named Defendants.

177.     Korf benefitted from the improper conduct of the named individual Defendants to the detriment of Wolf Auto.

178.     Defendants' conduct has caused serious damage to Plaintiffs, which entitles Plaintiffs to all of their actual damages including, but not limited to:  loss of income; lost profits; consequential and compensatory damages; special damages; interest on the amounts that were wrongfully obtained by Defendants; and all other remedies, both legal and equitable to which Plaintiffs are entitled, legal costs associated with this action; attorneys' fees; forensic computer expert fees; and all other damages the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs David J. Wolf and Wolf Auto Center Sterling LLC respectfully request this Court enter judgment in their favor against the Defendants jointly and severally, and award Plaintiffs:

A.     Injunctive relief as requested above;

B.     Compensatory damages;

C.     Consequential damages;

D.     Special damages;

E.     Exemplary damages;

F.     Treble damages for civil theft;

G.     Disgorgement of all profits wrongfully obtained;

H.     Pre-judgment and post-judgment interest to the fullest extent allowed by law;

I.     An award of Plaintiffs' costs, expert witness fees, and attorneys' fees to the fullest extent permitted by law;

J.        Such other and further relief as the Court deems just and proper.

DATED this 23rd day of December, 2015.

/s/ Craig D. Joyce
Craig D. Joyce
Michelle R. Magruder
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, CO  80202
Telephone Number:  (303) 830-2400
Facsimile Number:  (303) 830-1033
E-Mail:  cjoyce@fwlaw.com
E-Mail:  mmagruder@fwlaw.com

Attorneys for Plaintiffs

Addresses of Plaintiffs:

David J. Wolf
601 W. U.S. Highway 30
Kimball, NE  69145

Wolf Auto Center Sterling LLC
520 E. Chestnut Street
Sterling, CO  80751